**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Odell MARSHALL, Defendant-Appellant.**

**No. 74–2070.**

United States Court of Appeals, Ninth Circuit.

Oct. 31, 1975.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 10, 1976.

Barry Tarlow (argued), Los Angeles, Cal., for defendant-appellant.

Darrell McIntyre, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

OPINION

Before BARNES, WRIGHT and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

On November 30, 1973, officers of the Los Angeles Police Department closed the net on a major narcotics transaction. Based upon informer tips, independent investigation and surveillance of suspects, the police believed that Marshall was a heroin dealer who made deliveries to customers from other cities through a female, Harris, who lived with him. The narcotics were supplied, the police believed, by Macias and were stored, they learned, in an apartment registered to Tuminello. After completing a heroin sale at the Los Angeles Hilton Hotel to Strickland, an out-of-town buyer, Marshall and Harris were arrested in the hotel parking garage. $34,000 in cash was seized from Harris, along with 0.3 grams of cocaine. $5,000 was seized from Marshall, along with 1.7 grams of cocaine. Strickland was arrested checking out of the hotel; in his possession were 2000 grams of heroin. Shortly afterwards, police searched Tuminello's apartment, finding a suitcase containing 502.1 grams of heroin and 155 grams of cocaine.

Marshall, Macias, Harris, Tuminello and Strickland were indicted on various counts of conspiracy to possess and distribute a controlled substance, 21 U.S.C. § 846, and with possession and distribution of a controlled substance, 21 U.S.C. § 841(a)(1). In Count One all defendants were charged with conspiracy to possess and distribute heroin. In Count Two Macias, Marshall and Tuminello were charged with possession with intent to distribute the heroin found in Tuminello's apartment. Count Three charged Macias, Marshall and Harris with possession with intent to distribute the heroin found in Strickland's suitcase. Count Four charged Marshall and Harris with distribution of the heroin found in Strickland's suitcase. Count Five charged Strickland with possession of the heroin found in his suitcase.

Before trial Strickland pleaded guilty; at trial he testified about his transactions with the other defendants. After a jury trial, Tuminello was acquitted. Harris was found guilty on Counts One, Three and Four; she has since died and her appeal has been dismissed. Macias was found guilty on Counts One and Three; he has since disappeared and his appeal has been dismissed. *United States v. Macias*, 519 F.2d 697 (9th Cir. 1975). Marshall was found guilty on Counts One, Three and Four. He appeals and we affirm.

## I. *The Tax Liens and Levies*

The $39,000 seized from Marshall and Harris on November 30 was held by the Los Angeles Police Department. On December 1, Marshall assigned all of his interest in the money to an attorney, Bate, for legal services. On December 3, Bate assigned his interest to Marshall's present attorney, Tarlow. Harris also assigned her interest to Tarlow on December 3. Meanwhile, the Internal Revenue Service terminated Marshall's and Harris' taxable years pursuant to 26 U.S.C. § 6851. Notice and demand were sent to each of them and on December 3, notices of levy were served on the Los Angeles Police Department. Notices of federal tax liens were then filed with the Registrar Recorder of the County of Los Angéles. On December 3, the State Franchise Tax Board also levied upon the money held by the police department for taxes due the State of California.

Following the tax levies, the Los Angeles Police Department filed an interpleader action in the Superior Court naming Tarlow, Bate, the State of California and the United States as defendants. The action was removed to a federal district court where it is now pending. *City of Los Angeles v. Tarlow,* Civ. No. 74–513–RJK (C.D.Cal.).

Before trial, Marshall and Harris asserted that there would be a conflict of interest if a single attorney represented them both, but that because the money they had assigned had been seized, they could not obtain separate counsel of their own choice.[1] In a series of pretrial motions and hearings on the motions, they contended that both tax levies were part of á conspiracy between law enforcement officers and taxing authorities to deprive them of rights under the Sixth and Fourteenth Amendments. They supported these allegations with several affidavits of attorneys to the effect that tax levies were common in criminal cases in which large sums of money had been seized, that the levies came quickly after the seizures and that the tax demanded was usually equal to or greater than the money seized. Marshall and Harris offered to substantiate their charges if granted extensive discovery against both the state and federal taxing authorities.[2] The trial court ruled that it did not have jurisdiction to enjoin enforcement of the tax liens and levies, either directly by injunction or indirectly pursuant to a Rule 41(e) motion for return of property. The court also ruled that Marshall and Harris had not made a showing sufficient to justify either a dismissal of the indictment for government misconduct or approval of the massive discovery requested. For the reasons now outlined, we conclude that the district court did not err.

### A.

At the outset we note the strong congressional policy against judicial interference in the tax collecting process. A taxpayer may pursue a cause of action for refund of federal taxes only after an

1. Although Marshall raises instances of potential conflict at trial, we assume this is only to show that if the trial court's rulings on the tax lien motions were incorrect, the error was prejudicial. However, if these rulings were correct, Marshall waived any conflict. We can only conclude that both Marshall and Harris were aware of their right to separate appointed counsel. For tactical reasons, they chose jointly to retain Tarlow, despite the asserted conflict of interest.

2. The discovery Marshall and Harris sought included: all tax files and working papers, investigatory records, etc., which were related to the tax assessments against them; all state and federal tax documents, manuals, memoranda, internal correspondence, rules, etc., relating to tax jeopardy assessments and levies; all federal and state tax files and all internal memoranda relating to the tax files of all Los Angeles County, Orange County and San Diego County taxpayers against whom tax asessments and levies were brought in conjunction with criminal prosecutions for the years 1972 and 1973; the names, addresses and telephone numbers of all persons involved in any manner with the making of either state or federal jeopardy assessments; all documents and internal communications of the Los Angeles Police Department, the Los Angeles County Sheriff, and state and federal narcotics officers which deal with cooperation between law enforcement and taxing officials.

administrative claim for refund has been filed and either denied or held without action for six months. 28 U.S.C. § 1346; 26 U.S.C. §§ 6532, 7422; *United States v. Freedman*, 444 F.2d 1387, 1388 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 538, 30 L.Ed.2d 544 (1971). As to the California tax levy, the Tax Injunction Act, 28 U.S.C. § 1341, provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." Moreover, the Anti-Injunction Act, 26 U.S.C. § 7421(a), provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." The Supreme Court has said of this statute:

> The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund. In this manner the United States is assured of prompt collection of its lawful revenue.

*Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962) (footnote omitted). *See also Bob Jones Univ. v. Simon*, 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

Marshall asserts that the federal levy was enjoinable under the exception to 26 U.S.C. § 7421(a) as set forth in *Enochs v. Williams Packing & Navigation Co., supra*. *Williams Packing* held that injunctive relief is available only when the taxpayer can show (1) that under no circumstances could the government ultimately prevail on its legal right to the disputed sums, viewing the facts and law most favorably to the government, and (2) that he has no adequate legal remedy for obtaining relief from the Commissioner's actions. *Id.* at 6–7. *Westgate-*

*California Corp. v. United States*, 496 F.2d 839, 842–43 (9th Cir. 1974). The circuits have not been entirely consistent in applying this exception when the injunction is sought against a tax levy on money seized in a narcotics arrest as part of an alleged conspiracy between law enforcement officials and taxing authorities. *Compare Aguilar v. United States*, 501 F.2d 127, 130–31 (5th Cir. 1974), *Willits v. Richardson*, 497 F.2d 240, 245–46 (5th Cir. 1974), *Lucia v. United States*, 474 F.2d 565, 573–75 (5th Cir. 1973) (en banc), *and Pizzarello v. United States*, 408 F.2d 579, 583–84 (2d Cir.), *cert. denied*, 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969), *with Lewis v. Sandler*, 498 F.2d 395, 398–99 (4th Cir. 1974).

We need not decide whether the tax collection was enjoinable, however, because such a request is inappropriate in a criminal trial. Marshall cites no case in which the tax collection was enjoined in a criminal proceeding and for good reason. An injunction binds only parties to the action. *See* Fed.R.Civ.P. 65(d). Here, Marshall and Harris never claimed an interest in the money; the real claimants, in addition to the United States, are Tarlow and the State of California who are not parties in the criminal action before us, nor could they be. In a civil proceeding, on the other hand, each interested party could be joined and given an opportunity to assert his claim. *See, e. g., Kelly v. Springett*, 527 F.2d 1090 (9th Cir. 1975). Moreover, the broader discovery permitted by the civil rules would allow the claims of improper assessment to be more fully ventilated. An immediate civil action to enjoin the tax collection would also be an effective alternative to resolution in the criminal trial. It could be a speedy proceeding and, if the trial court believed it to be necessary, the criminal trial could be continued pending resolution of the injunction proceedings. We, therefore, affirm the district court's denial of Marshall's motion to dissolve the tax levies.

■ Marshall's motion under Rule 41 for the return of illegally seized property was simply an attempted end run around the statutory impediments. Once property has been levied upon by the government for payment of taxes, the taxpayer must proceed in the proper civil forum. *See United States v. Freedman, supra,* 444 F.2d at 1388; *but see United States v. Bonaguro,* 294 F.Supp. 750, 754 (E.D. N.Y.1968), *aff'd sub nom. United States v. Dono,* 428 F.2d 204 (2d Cir.), *cert. denied,* 400 U.S. 829, ˚91 S.Ct. 57, 27 L.Ed.2d 59 (1970). As we have already concluded, when the taxpayer contends that the Anti-Injunction Act is not applicable, the proper procedure is a civil suit to dissolve the levy. Moreover, the district court properly denied the Rule 41 motion because, as we will discuss, the money was not illegally seized. Nor did Marshall claim lawful possession. These are prerequisites to return under Rule 41(e). *See* Fed.R.Crim.P. 41(e), 1972 Advisory Committee Note.

### B.

■ Marshall asserts that, even if an injunction or Rule 41(e) motion for return of property is inappropriate, the district court should have provided alternative funds or dismissed the charges. Unlike the previous motions, he argues, there are no jurisdictional impediments to this request.

If a defendant could show that the prosecution was party to a conspiracy which deprived him of all funds to hire counsel of his choice, the court would not be powerless to take appropriate action. It is not enough, however, to show that the tax assessment was so illegally procured as to be enjoinable under the *Williams Packing* exception to the Anti-Injunction Act. Even assuming Marshall's request for dismissal or for government funds might be appropriate in some cases (which we specifically do not decide), a defendant must also show a bad faith connection between the prosecution and the alleged unwarranted tax collection effort in order to prevail. This fol-

lows, because the crux of the claim is prosecutorial misconduct. Regardless of the propriety of the conduct of the IRS agents, which we do not examine, there is no support for the contention that they acted in collusion with the prosecutor. In their eagerness the taxing authorities may overstep their authority to seize property, but this is not sufficient to show an attempt to hamper a criminal defendant's defense. The trial court properly denied the relief requested.

### C.

■ Marshall contends that the court's denial of his discovery request prevented him from making a more substantial showing of prosecutorial misconduct. We find that the denial of extensive discovery was not an abuse of the court's discretion. First, Marshall's claimed infringement of constitutional rights was quite tenuous. Marshall and Harris were not denied their rights to paid counsel of their choice. They both hired Tarlow, paying for his services in advance by assigning all their rights to the money held by the police. Nor were they denied separate counsel—they were both aware of their right to court-appointed counsel but chose, despite their asserted conflict of interest, jointly to retain Tarlow. See note 1, *ante.* Their claim is a denial of an alleged right to *separate* and *privately retained* counsel. No such right exists unless the defendants have the money to pay for the separate counsel, *cf. Kelly v. Springett,* 527 F.2d 1090 (9th Cir. 1975); here they had both previously assigned what they claimed to be all of their money to Tarlow. (The tax levies allegedly took place after these assignments.) Had the taxing authorities not levied upon the money and had it been turned over to Tarlow, they claim that Tarlow would then have used a portion of the money to hire separate counsel for either Marshall or Harris. In sum, Marshall's claim of deprivation is speculative. Whatever the government's action, in this case it only incidentally affected any of Marshall's trial rights.

Second, Marshall made no preliminary showing of reasonableness and materiality to justify the massive discovery requested. Fed.R.Crim.P. 16(b). Both his offer of proof and the arguments at the hearing were directed primarily at showing overzealous tax collection. The only support for a bad faith connection between the criminal prosecution and the tax collection were allegations of a conspiracy to deprive criminal defendants of counsel. Given the tenuous infringement of rights in this case and the alternative remedies available in a civil suit, the trial court did not abuse its discretion in finding these unsupported allegations insufficient to justify the extensive discovery requested.

■ Marshall also served subpoenae duces tecum to secure certain records. The trial court properly quashed them. These subpoenae are not discovery devices. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S.Ct. 675, 95 L.Ed. 879 (1951). Nor did they meet the requirements of relevancy, admissiblity and specificity. *United States v. Nixon*, 418 U.S. 683, 698–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

## II. *Search Incident to Arrest*

■ Marshall contends that the evidence seized incident to the arrests by local officers of Strickland, Harris and himself should have been suppressed because the arrests were made without probable cause. We disagree. California authorizes a police officer to arrest without a warrant "[w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." Cal. Penal Code § 836. *See People v. Gardner*, 252 Cal. App.2d 320, 324, 60 Cal.Rptr. 321, 323–24 (1967). At the hearing on the motion to suppress the government introduced sufficient evidence to show that the arrest was supported by reasonable and probable cause.

An informant told the Los Angeles Police that Marshall regularly purchased heroin from a male Mexican-American named "Danny" whose wife was named "Carmen" and who could be reached at a specific telephone number. (These are the first names of Macias and his wife.) The informant said that one of Marshall's large quantity customers was a male Negro named Ernest Brock from Cleveland, Ohio; other customers were from Michigan and Philadelphia. Indeed, the informant said, Marshall had recently sold five kilograms of heroin to these customers. Marshall's mode of operation, the informant related, was to obtain monthly shipments of heroin from "Danny" and resell to his customers who came to Los Angeles. The informant advised that Brock, for instance, would come to Los Angeles to make his purchases, stay at the Eighth and Garland Holiday Inn, and then return to Cleveland.

The officers had good reason to rely upon this informant's information. First, he had provided approximately 15 tips over the previous two months, leading to one arrest. Second, this information was consistent with what the police already knew of Marshall's activities. Over the previous year the police had received information from approximately 20 informants that Marshall was a heroin dealer and that Harris was making deliveries for him to customers from Los Angeles and other cities. *See United States v. Harris*, 403 U.S. 573, 581–83, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *cf. Musgrove v. Eyman*, 435 F.2d 1235, 1238 (9th Cir. 1971).

It is true that the informant's allegations of specific transactions were not supported by knowledge of how the informant learned of the transactions. *See Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The police, however, by independent investigation corroborated many of the details of the informant's tip. *See United States v. Cleaver*, 402 F.2d 148, 151 (9th Cir. 1968), *cert. denied*, 394 U.S.

966, 89 S.Ct. 1312, 22 L.Ed.2d 568 (1969). The telephone number was registered to Carmen Macias, whose husband, Danny, was reputed to be a heroin dealer and was on parole for a heroin violation. This reputation is relevant. *Cf. United States v. Harris, supra,* 403 U.S. at 581–83, 91 S.Ct. 2075. The police also verified that Ernest Brock had in the past stayed at the named Holiday Inn. Brock was also connected with Marshall. Earlier in 1973 Brock had been stopped; in his possession was an automatic pistol and a telephone receipt for Marshall and he said he was visiting Marshall. With these details of the informant's information verified, the officers had reasonable grounds to believe that the remaining unverified information—that Marshall was engaged in heroin sales—was likewise true. *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

On November 28, 1973, the manager of the Eighth and Garland Holiday Inn telephoned one of the case officers to tell him Brock was once again registered. Surveillance of Brock was begun that day and of Marshall's apartment on the following day. On November 29, Brock was followed to Marshall's apartment. He entered with a suitcase and left a few minutes later without it. At 6:00 p. m. Brock returned to the apartment and left with a package under his arm. He took the package to a room in a local hotel registered to Jesse King, who had a plane reservation to Cleveland that night. Brock returned to Marshall's apartment at 12:30 a. m. on the 30th and left with a suitcase at 3:15 a. m. He had a plane reservation to Cleveland for later that morning.

During the night, Howard, a reputed narcotics dealer, came and left Marshall's apartment. At 12:45 a. m. Marshall drove to Tuminello's apartment in the same apartment complex. At 4:00 a. m. Marshall and Macias met in the parking lot and drove to Tuminello's apartment. Marshall and Macias returned to Marshall's apartment shortly after 6:00 a. m. At 6:15 a. m. a previously uniden- tified person, Strickland, left Marshall's apartment and drove to the Hilton Hotel. At 10:15 a. m. Strickland purchased an airplane ticket to Philadelphia. At 10:50 a. m. Harris left Marshall's apartment carrying two flight bags; Marshall left in a separate car a few minutes later. Harris arrived at the Hilton Hotel at 11:15 a. m. and met Marshall in the curio shop about 11:20. Both then went to Strickland's room, where they stayed for about 30 minutes.

In light of the informant's tip, their previous knowledge of Marshall's and Harris' activities, the confirmation of the informant's details, and the flurry of activity during the previous 24 hours, the police thought that Macias had made his monthly delivery of heroin to Marshall and that Marshall was in the process of dealing it to his customers. Brock, King and Strickland all had plane reservations out of Los Angeles on the 30th. Strickland was, they thought, the Philadelphia buyer that the informant had reported. The meeting in the hotel room, the arresting officers surmised, was to deliver heroin. Upon leaving Strickland's room, Marshall and Harris were arrested in the hotel garage; Strickland was simultaneously arrested as he was checking out.

Probable cause to arrest without a warrant exists if the facts and circumstances known to the arresting officers and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is about to be committed. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Cleaver, supra,* 402 F.2d at 151; *People v. Rhinehart,* 9 Cal.3d 139, 151, 107 Cal. Rptr. 34, 42, 507 P.2d 642, 650 (1973). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States, supra,* 338 U.S. at 175, 69 S.Ct. at 1310. We have no doubt that the district court

correctly determined the police officers arresting Marshall, Harris and Strickland, in light of their total police experience and armed with their previous information and current observations, had probable cause to arrest. *Long v. United States,* 422 F.2d 1024, 1026 (9th Cir. 1970).

Thus the trial court properly denied Marshall's motion to suppress the $39,000 and cocaine seized at the time of Harris' and his arrest. As to the heroin seized from the suitcase Strickland was carrying, we doubt that Marshall has standing to raise the issue. As in *Brown v. United States,* 411 U.S. 223, 227–30, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), Marshall had already sold the seized evidence prior to the contested search and seizure. *See United States v. Capra,* 501 F.2d 267, 272 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). Even if Marshall has standing, however, the evidence was properly seized incident to Strickland's arrest, which was based upon probable cause. *See United States v. Maynard,* 439 F.2d 1086, 1087 (9th Cir. 1971); *United States v. Mehciz,* 437 F.2d 145, 147–48 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971). Moreover, the trial court's finding that, from the totality of circumstances, Strickland consented to the search was not clearly erroneous. *United States v. Page,* 302 F.2d 81, 85 (9th Cir. 1962).

### III. *The Tuminello Apartment Search*

Marshall contends that the district court erred in failing to suppress the evidence seized from Tuminello's apartment. Assuming that Marshall has standing under *Jones v. United States, supra,* 362 U.S. at 263–64, 80 S.Ct. 725, this raises a substantial question of third party consent: Did Tuminello, the registered owner and sole resident of the apartment, have authority to consent to a search of a locked suitcase which the police were told belonged to Marshall? However, we need not reach the issue. The evidence was introduced in support of Count Two (possession of the heroin found in Tuminello's apartment), but Marshall was not convicted on that count.

■ Marshall argues that even if the evidence seized from Tuminello's apartment were unnecessary for his conviction under Counts Three and Four, it contaminated the trial as a whole. We disagree. While the jury concluded that Marshall was guilty of Counts Three and Four (pertaining to the heroin found with Strickland), it apparently could not reach a decision against Marshall on Count Two. If the introduction of that heroin into evidence was so devastating as to prejudice the jury and result in Marshall's being convicted on Counts Three and Four, logic would dictate that the jury would not have been undecided on Count Two. As the jury apparently could not find the evidence sufficient to connect Marshall with possession of the heroin in Tuminello's apartment, we fail to see how its admission could substantially affect Marshall with respect to the counts charging possession of the heroin found in Strickland's suitcase, about which the evidence was overwhelming. Thus we conclude that as regards this issue if there were error it was harmless under the standard established by *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Marshall received a fair trial and he could expect nothing more.

■ We need not decide whether the heroin seized in Tuminello's apartment might have in some way tainted Marshall's conviction on the conspiracy count (One). The sentence he received on Count One was to run concurrently with those received on Counts Three and Four and we, therefore, choose not to consider the issue. *United States v. Hicks,* 455 F.2d 329, 330 (9th Cir. 1972).

### IV. *Identity of Informants*

Marshall contends that the district court erred in denying his motion to compel disclosure of the identity of all police informants. The government, of course, has a legitimate interest in pro-

tecting the confidentiality of informants because disclosure of their identity ends their usefulness and discourages others from providing information.

Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity—to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him.

8 Wigmore, Evidence § 2374, at 762 (McNaughton rev. 1961). *See Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Yet in *Roviaro*, the Supreme Court held that disclosure is required in limited situations. "Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [informer's] privilege must give way." *Id.* at 60–61, 77 S.Ct. at 628 (footnote omitted). There is no fixed rule for when the informer must be disclosed. "The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62, 77 S.Ct. at 628. In balancing these competing interests, however, the burden of proof is on the defendant to show need for the disclosure. *United States v. Alvarez*, 472 F.2d 111, 113 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *United States v. Kelly*, 449 F.2d 329, 330 (9th Cir. 1971).

 Marshall made no such showing. No entrapment defense was raised nor did Marshall show that the police informants participated in or witnessed the offenses with which he was charged. A mere suspicion that the informer may be helpful to the defense is not sufficient to overcome the public interest in protecting the informer's identity. The court did not abuse its discretion in denying disclosure. *United States v. Edwards*, 503 F.2d 838, 840–41 (9th Cir.

1974). Nor did the court abuse its discretion in denying Marshall's motion for *in camera* questioning of informants to discover whether they might possess information favorable to the defense. *Cf. United States v. Anderson*, 509 F.2d 724, 729–30 (9th Cir. 1975).

 Marshall argues, however, that he was entitled to litigate the existence and reliability of the informants at the hearing on his motion to suppress. Yet Marshall was not curtailed in his right to cross-examine the police officers who testified on the issue of probable cause; he was only denied the right to question informants directly because to do so would have revealed their identity. Marshall had no Sixth Amendment right to cross-examine the officers as to the informers' identities. *McCray v. Illinois*, 386 U.S. 300, 314, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). Nor did he have any due process right to the disclosure of the identity of informants who provided only information which, combined with other facts, gave the officers probable cause to arrest. *Id.* at 311, 314, 87 S.Ct. 1056; *United States v. Mehciz, supra*, 437 F.2d at 148–49.

## V. Discovery of Grand Jury Proceedings

Federal Rule of Criminal Procedure 6(f) provides in part: "An indictment may be found only upon the concurrence of 12 or more jurors." Rule 6(c) provides that the grand jury foreman "or another juror designated by him shall keep a record of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court, but the record shall not be made public except on order of the court."

Before trial, Marshall moved for disclosure and inspection of the method by which there was compliance with Rule 6(f). The government, in its response, agreed to permit inspection of the grand jury ballot and the return indicating the number of jurors concurring in the indictment. The trial judge ordered the

**1360**

discovery and it was determined that 17 grand jurors had concurred.

 Marshall contends, citing *United States v. Bullock*, 448 F.2d 728, 729 (5th Cir. 1971), that he should have been permitted to discover, by inspection of the transcript or interviews with those present, whether the concurrences of the individual jurors were genuine. He has no such right. In *Bullock*, the defendant moved to dismiss the indictment upon the specific allegation that it was seen and signed only by the foreman and that 12 or more grand jurors did not concur. *Id.* at 728. The court required only that, upon such a motion, the defendants be permitted to inspect the record required by Rule 6(c). *Id.* at 729. Although Marshall made no specific allegations of misconduct, the government voluntarily offered inspection. No more was required.

## VI. *Polygraph*

Prior to trial Marshall moved to introduce polygraph test results. After considering the offer of proof and hearing arguments, the trial court denied the motion. Marshall contends that this was error.

 In *United States v. De Betham*, 470 F.2d 1367, 1368 (9th Cir. 1972), *cert. denied*, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973), we indicated that expert testimony relating to polygraph tests may be admissible, yet we gave the district courts wide discretion in refusing to admit the testimony. Because the polygraph has yet to gain general judicial recognition, the proponent of such evidence has the burden of laying a proper foundation showing the underlying scientific basis and reliability of the expert's testimony. *See United States v. Wainwright*, 413 F.2d 796, 803 (10th Cir. 1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1970); *Frye v. United States*, 54 U.S.App.D.C. 46, 293 F. 1013, 1014 (1923); *United States v. Ridling*, 350 F.Supp. 90, 94 (E.D.Mich. 1972). Even if a proper foundation can be laid, the district court can consider that introduction of the polygraph evi-dence will inject a time-consuming, potentially prejudicial and, perhaps, confusing collateral issue into the trial. *See United States v. Urquidez*, 356 F.Supp. 1363, 1365–67 (C.D.Cal.1973).

 With the polygraph's misleading reputation as a "truth teller," the widespread debate concerning its reliability, the critical requirement of a competent examiner and the judicial problems of self-incrimination and hearsay, a trial court will rarely abuse its discretion by refusing to admit the evidence, even for a limited purpose and under limited conditions. *United States v. Demma*, 523 F.2d 981, 987 (9th Cir. 1975) (en banc). In the present case the trial judge did not do so. *Id.; United States v. Alvarez, supra*, 472 F.2d at 113; *United States v. De Betham, supra*, 470 F.2d at 1368; *United States v. Salazar-Gaeta*, 447 F.2d 468, 469 (9th Cir. 1971); *United States v. Sadrzadeh*, 440 F.2d 389, 390 (9th Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 88 (1971).

## VII. *The Cocaine*

 At the time of their arrest, 0.3 grams of cocaine were seized from Harris and 1.7 grams of cocaine were seized from Marshall. Marshall contends that the admission of the cocaine into evidence was prejudicial error. Generally, of course, proof of other crimes is not admissible to show the defendant's bad character or that he was likely to have committed the crime charged. *Bush v. United States*, 267 F.2d 483, 489 (9th Cir. 1959). Such evidence, however, can be admitted for other proper purposes, such as to show a common scheme or design, a motive or intent, the absence of mistake or accident, or that the acts are so inextricably connected with the crime charged as to tend to prove it. *Id.; Parker v. United States*, 400 F.2d 248, 252 (9th Cir. 1968), *cert. denied*, 393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969). The cocaine in this case was admitted only against defendants Marshall and Harris to show knowledge, intent and motive. Both heroin and cocaine are

"narcotic drugs" under 21 U.S.C. § 802(16); if the jury could find Marshall knew the character and uses for the cocaine, they might reasonably infer that he knew the character and uses for the heroin. *See United States v. Perez,* 491 F.2d 167, 171–72 (9th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974). To eliminate undue prejudice, the district judge specifically instructed the jury that proof of possession of the cocaine could not be considered in determining whether Marshall or Harris did any of the acts charged in the indictment. It was to be considered, the court instructed, only "for the limited purpose of determining the defendants' knowledge of the character and nature of cocaine [in order to ascertain] the defendants' state of mind or intent with which the accused did the acts charged in the indictment." Reviewing the record, "[w]e cannot say that the district court abused its discretion in deciding that the tendency of the cocaine evidence to prove the essential element of knowledge outweighed its potential prejudicial effect upon the accused." *United States v. Perez, supra,* 491 F.2d at 172.

## VIII. *Cross-examination of Strickland*

Strickland was the government's primary witness; he testified in detail about the transactions with which Marshall was charged. Marshall claims that his cross-examination relating to Strickland's credibility was unconstitutionally curtailed. Marshall desired to ask Strickland the same questions about the events surrounding his arrest as had been asked at the hearing on the motion to suppress. If his answers were different, he would be impeached; if his answers were the same, the police officers who testified to a different version of the facts would be called as impeaching witnesses.

The essence of the hoped-for conflict was to show that if Strickland lied at the hearing he was as likely to lie at trial. Such logic is a bit strained. First, the fact that a police officer and Strickland differently remember the facts sur-

rounding Strickland's arrest does not necessarily indicate that either is lying. Second, the events about which Strickland testified at the pretrial hearing were not the same as the events about which he testified at trial. Balanced against this marginal relevance, the trial court noted that to allow this line of questioning would relitigate the entire motion to suppress, which took several days.

Criminal defendants are entitled to great latitude in their efforts to impeach the credibility of government witnesses in cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315–18, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Alford v. United States,* 282 U.S. 687, 691–94, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Harris,* 501 F.2d 1, 8–9 (9th Cir. 1974); *United States v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955, 963 (1974). The need for effective cross-examination is especially strong with a "turncoat witness" upon whose testimony the government's case depends. In this case, however, Marshall's counsel extensively cross-examined Strickland in order to impeach his credibility. Strickland was questioned about his past criminal record, his motives for testifying for the government (which included the details of the plea bargain), his relationship with the defendants and any possible bias or prejudice. These explorations were largely unrestrained. Under these circumstances the judge thought the marginal relevance of the additional (and quite speculative) hoped-for impeachment evidence did not justify delaying and possibly confusing the trial. *United States v. Carrion,* 463 F.2d 704, 707 (9th Cir. 1972). The trial court has a well-recognized discretionary power to control exploration of such collateral matters. *Enciso v. United States,* 370 F.2d 749, 751 (9th Cir. 1967). In this case the trial court did not abuse its discretion. *See United States v. Phillips,* 482 F.2d 1355, 1357 (9th Cir. 1973), *cert. denied,* 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1974); *United States v. Haili,* 443 F.2d 1295, 1299 (9th Cir. 1971).

## IX. Arguments

During closing arguments, Marshall's attorney improperly argued to the jury that certain letters, introduced into evidence to show the plea bargain between the prosecution and Strickland's attorney, showed that Strickland was a liar. One letter indicated that at the hearing on the motion to suppress the trial judge found Strickland's testimony concerning his arrest, in comparison with that of the police officers', was not credible. *See United States v. Quinn*, 467 F.2d 624, 627 (8th Cir. 1972), *cert. denied*, 410 U.S. 935, 93 S.Ct. 1390, 35 L.Ed.2d 599 (1973). Such use of the letter was improper and the judge, sua sponte, attempted to cure any wrong inference by telling the jury that his finding regarding credibility at the pretrial hearing did not relate to any events to which Strickland testified at trial. Marshall's attorney objected that the judge was testifying as to Strickland's credibility. The judge then cured any such inference by a specific instruction to the jury that his remark was "to have no bearing on your ultimate determination of [Strickland's] credibility in this trial." The judge repeated his cautionary instruction at the conclusion of arguments. Even if the judge's original comments to the jury were error, it was adequately cured. *See United States v. Carlos*, 478 F.2d 377, 379–80 (9th Cir. 1973).

Affirmed.