**UNITED STATES of America,
Plaintiff-Appellee,
v.
Thomas L. EDEN, Defendant-Appellant.**

No. 80–1468.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1981.

Decided Oct. 26, 1981.

Rehearing and Rehearing En Banc
Denied Dec. 14, 1981.

Vincent J. Marella, Bird & Marella, Beverly Hills, Cal., for defendant-appellant.

Curtis B. Rappe, Los Angeles, Cal., for plaintiff-appellee.

Before HUG and FARRIS, Circuit Judges, and CLAIBORNE,* District Judge.

CLAIBORNE, District Judge:

On April 9, 1980, a federal grand jury for the Central District of California returned an eleven count indictment charging Thomas L. Eden with violations of 18 U.S.C. § 641, embezzlement and conversion of government funds (seven counts), and 18 U.S.C. § 1001, concealing material facts from the Department of Health, Education and Welfare (four counts).

Upon learning that a superseding indictment against the defendant was forthcom-

* Honorable Harry E. Claiborne, Chief United States District Judge, District of Nevada, sitting by designation.

ing, counsel for Eden moved the trial court for an order requiring certain exculpatory material (results of a polygraph test taken by defendant) to be presented to the grand jury. Eden's motion was denied and the grand jury returned a superseding eleven count indictment on May 30, 1980.

Eden was a founder and president of Associated Colleges of California, referred to during trial as A.C.C., a business college which participated in student financing under the Federally Insured Student Loan (F.I.S.L.) program through what was then the Department of Health, Education, and Welfare. A.C.C. participated in four separate educational programs which were the subject of the grand jury investigation: 1) the Supplemental Educational Grants Program (S.E.O.G.), 2) the College Work Study Program (C.W.S.), 3) the National Direct Student Loan Program (N.D.S.L.), and 4) the Basic Educational Opportunity Grants Program (B.E.O.G.).

In 1974, A.C.C. experienced "cash flow" problems and was forced to take out a loan in the approximate amount of $130,000 from Union Bank, repayment of which was personally guaranteed by defendant. A.C.C.'s financial difficulties continued, and in July, 1975, defendant sold A.C.C. to Urban Didier, with the provision that Didier was to assume personal liability for A.C.C.'s $130,000 loan from Union Bank.

When A.C.C. first began participating in Federally Insured Student Loan programs, a number of special bank accounts, in addition to its general account, were established at Union Bank to handle the funds received from H.E.W. As president of A.C.C., Eden was a signatory on all checks.

In September, 1975, Eden became aware that Didier had not executed the necessary loan assumption documents and defendant was still personally liable on the $130,000 A.C.C. loan at Union Bank. Eden closed out all of the old accounts, including the N.I.H. and special program accounts, and transferred those funds into a new general

account at Union Bank, which was the only new account opened. The total funds transferred amounted to $96,821.12, which was offset by a deficit balance of $17,309.60 in the old general account.

Eden testified he believed the above funds could be properly transferred from the special program accounts into the new A.C.C. general account because defendant believed the funds belonged to A.C.C. Donna Palmer, the Coordinator of Financial Aid at A.C.C., testified she had shown the applicable H.E.W. regulations to defendant which mandate that under no circumstances could federal money be put directly into the A.C.C. general account from the various special program accounts. On or about September 22, 1975, upon learning that A.C.C. was closing down, Donna Palmer informed defendant that all allowable disbursements of special program funds had been made and that the remaining $100,000 had to go back to the federal government. Instead, Eden drew certain checks on said accounts made payable to various individuals who in turn cashed the checks and delivered the bulk of the funds back to Eden.

At trial, defendant admitted the acts alleged in the indictment, but testified the checks were issued and the funds returned so that he could make payments on the A.C.C. loan at Union Bank without Didier knowing. The $130,000 loan at Union Bank was paid in full by June, 1976. A.C.C. closed for semester break in September, 1975 and never reopened.

Concluding a six-day trial, Eden was found guilty by a jury on all eleven counts of the superseding indictment, from which he appeals and assigns six errors: 1) The jury was improperly instructed as to the definition of embezzlement and conversion; 2) The jury was improperly instructed that the funds alleged in Counts One through Seven of the indictment constituted government property as a matter of law; 3) The trial court improperly quashed defendant's subpoena to the Secretary of Education; 4) The trial court erred in refusing to admit into evidence the results of a polygraph examination of the defendant; 5) The trial court erred in refusing to compel the government to present exculpatory evi-

dence to the grand jury, including the results of a polygraph examination of the defendant; 6) The jury's verdict was not supported by sufficient evidence.

1) *Was the jury improperly instructed as to the definition of conversion?*

The trial court gave the following instruction on conversion:

To convert money or property to one's own use or to the use of another means to apply, appropriate, or use, such money or property for the benefit of the wrongdoer or another.

Conversion includes misuse or abuse of property as well as use in an unauthorized manner or to an unauthorized extent.

Eden attacks this instruction as completely negating the government's burden to prove specific intent and provided the jury with a confusing and incorrect definition of conversion. We agree that the instruction, standing alone, gives an incomplete and therefore inaccurate definition of conversion.

The government proposed the instruction which was given by the court. It is conceded in the briefs that the instruction is a modified version of § 16.01 Devitt and Blackmar, *Federal Jury Practice and Instructions* and founded on *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

The corpus of the modification was taken from the following language in *Morissette* :

The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances. Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. "To steal means to take away from one in lawful possession without right with the intention to keep wrongfully." *Irving Trust Co. v. Leff*, 253 N.Y. 359, 364, 171 N.E. 569, 571. Conversion, however, may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the

converter was entirely lawful. *Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use.* (Emphasis added.) Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

A fair reading clearly shows that the above was a recitation of examples—nothing more. The court did not equate misuse with conversion nor did it hold that any misuse or abuse of property or use in any unauthorized manner automatically constitutes conversion and it did not undermine the need for a finding of a serious violation of the owner's right to control the use of the property. *United States v. May*, 625 F.2d 186, 192 (8th Cir. 1980).

Indeed, the court held to the contrary, stating at page 254:

Had the statute applied to conversions without qualification, it would have made crimes of all unwitting, inadvertent and unintended conversions. Knowledge, of course, is not identical with intent and may not have been the most apt words of limitation. But knowing conversion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion. In the case before us, whether the mental element that Congress required be spoken of as knowledge or as intent, would not seem to alter its bearing on guilt. For it is not apparent how Morissette could have knowingly or intentionally converted property that he did not know could be converted, as would be the case if it was

in fact abandoned or if he truly believed it to be abandoned and unwanted property.

And at pages 254 and 255:

The purpose which we here attribute to Congress parallels that of codifiers of common law in England and in the States and demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses. It is significant that the English and State codifiers have tried to cover the same type of conduct that we are suggesting as the purpose of Congress here, without, however, departing from the common law tradition that these are crimes of intendment.

We find no grounds for inferring any affirmative instruction from Congress to eliminate intent from any offense with which this defendant was charged.

■ The second paragraph of the instruction does not clearly state the applicable principles and should be avoided in future cases. However, any error in the instruction was cured by the instructions as a whole when viewed in their entirety.

■ It is well established in this circuit that an instruction is not reviewed in a "vacuum" or in the abstract; rather, the adequacy taken in the context of the whole trial is the proper scope of inquiry. *United States v. Federbush*, 625 F.2d 246, 255 (9th Cir. 1980); *Stoker v. United States*, 587 F.2d 438, 440 (9th Cir. 1978); *United States v. James*, 576 F.2d 223, 226–27 (9th Cir. 1978); *United States v. Pallan*, 571 F.2d 497, 501 (9th Cir. 1978).

Here the requirement of specific intent was not omitted. The trial judge gave the following instruction prior to the definition of conversion:

The crime charged in Counts One through Seven of the indictment is a serious crime which requires proof of a specific intent before the defendant can be convicted. Specific intent as the term implies, means more than the general intent to commit the act.

To establish specific intent as required in Counts One through Seven, the government must prove the defendant acted with intent to appropriate money belonging to the United States, to a use inconsistent with the owner's rights and benefits.

The jury was also instructed that the government must show beyond a reasonable doubt that "the defendant acted knowingly, willfully and with the intent to appropriate the money to a use inconsistent with the owner's rights and benefits." Viewed as a whole, the instructions were not misleading and fairly and adequately instructed the jury as to the definition of conversion.

2) *Was the jury improperly instructed that the funds alleged in Counts One through Seven constituted government property as a matter of law?*

Over defendant's objection, the trial court gave the following instruction regarding the funds at issue:

That money embezzled or converted belonged to the United States is also an essential element of the offense charged in Counts One through Seven of the indictment. You are instructed with respect to the money alleged to have been converted in Counts One through Seven of the indictment that: Although $4,658.40 of the money in the C.W.S. account belonged to the institution, the remaining $92,162.70 of the funds in the NIH, NDSL, BEOG, SEOG, and CWS account belonged to the United States, and only proper disbursement in the full compliance with the regulations of the Department of HEW could legally change ownership of these funds.

Eden argues the above instruction was improper in that it took the issue of government ownership from the jury. Eden, relying heavily on *United States v. Alessio*, 439 F.2d 803 (1st Cir. 1971), urges that this issue as to the title of the property is a finding of fact that must be left to the jury. In *Alessio*, the trial court refused to allow *any* evidence supporting the defendant's contention that the property at issue did not belong to the government. Eden,

however, omits languages from *Alessio* that is most applicable here:

The court could properly make a ruling of law with respect to title, predicated upon findings of fact which it left to the jury. However, it is clear that the court did more. It left nothing to the jury. (*Id.* at 804).

The trial court's instruction regarding the ownership of the funds appropriately narrowed the focus of the jury, but did not entirely take the issue from them. Whether or not there had been proper disbursement of the funds, in full compliance with the regulations of the Department of H.E.W., was a factual issue left to the jury.

The trial court's instruction is not inconsistent with this court's decisions in *United States v. Jackson*, 436 F.2d 39 (9th Cir. 1980), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); *United States v. Miller*, 520 F.2d 1208 (9th Cir. 1975); and *United States v. Johnson*, 596 F.2d 842 (9th Cir. 1979). In *United States v. Miller, supra*, p. 1211, we said "whether an item is government property ordinarily is a question of law, and when the facts so establish, it is proper for the court to give such an instruction."

In *United States v. Johnson, supra*, p. 846, we approved the "ownership" analysis under § 641 enunciated by the Fifth Circuit in *United States v. Evans*, 572 F.2d 455, 472 (5th Cir. 1978), which also involved funds administered under the Federal Direct Student Loan Program expressly adopting the following language:

The critical factor in determining the sufficiency of the federal interest in intangible interests, such as are involved here, is the basic philosophy of ownership reflected in relevant statutes and regulations. The key factor involved in this determination of federal interest is the supervision and control contemplated and manifested on the part of the government.

The trial court's instruction was appropriate under the facts of this case.

3) *Was the quashing of defendant's subpoena to the Secretary of Education improper?*

Eden subpoenaed documents from the Department of Education for production prior to trial under Rule 17(c), Federal Rules of Criminal Procedure. The subpoena requested documents in five categories, four of which are relevant to this appeal:

A. Any and all books, papers, documents or other objects which relate or refer to the California Business College and the allocation and payment to the California Business College of student financial aid funds through the National Institute of Health, College Work Study Program, National Defense Student Loan Program, National Direct Student Loan Program, Basic Educational Opportunity Grant for the period from January, 1974 to January, 1976.

B. Any and all books, papers, documents or other objects which relate or refer to California Business College and its accreditation and/or loss of accreditation.

C. Any and all books, papers, documents or other objects which relate or refer to the payment of $100,000 to Associated Colleges of California, 661 South Burlington Avenue, Los Angeles, California 90057 by way of Treasury Check No. 83,-760,968 dated September 15, 1975 and further designated on its face, "NIHA280".

D. Any and all books, papers, documents or other objects which relate or refer to the allocation and/or payment of student funds through the National Institute of Health, College Work Study Program, National Defense Student Loan Program, National Direct Student Loan Program, Basic Educational Opportunity Grants, and/or Supplemental Educational Opportunity Grants to institutions which were unaccredited at the time the allocation and/or payment was made, for the period January, 1974 to January, 1976.

The government moved to quash the subpoena. The trial court found that much of the material was otherwise procurable reasonably in advance of trial by the exercise of due diligence, or not so voluminous as to require pretrial production.

Eden argues that the trial court abused its discretion in so ruling. The party seeking to use the use of a subpoena under Rule 17(c), Federal Rules of Criminal Procedure, must show: 1) relevancy, 2) admissibility, and 3) specificity. *United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039. In order to justify a subpoena for production before trial, the proponent must also demonstrate that the subpoenaed materials are not available from any other source and their examination and processing should not await trial in the circumstances shown. These determinations are of course committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon determination of factual issues.

Eden failed to meet his burden in a number of respects. He failed to make any show of relevancy other than mere conclusory statements. The record also reveals that the discovery documents provided to Eden by the government adequately covered his contention on appeal.

4) *Did the trial court err in refusing to admit into evidence the results of a polygraph examination of the defendant?*

Eden made a pretrial motion to admit the results of a polygraph examination into evidence which the court denied.

Eden voluntarily submitted to a polygraph examination concerning whether or not he intentionally concealed facts from H.E.W. and whether or not he intentionally converted government funds to his own use. Attached to Defendant's motion was a six-page declaration by Theodore Paul Ponticelli regarding his qualifications as a polygraph expert and the results of the examination administered to Defendant.

The trial judge refused to allow the results of the examination based on *United States v. Urquidez*, 356 F.Supp. 1363 (C.D. Cal.1973); *United States v. Marshall*, 526 F.2d 1349 (9th Cir. 1975); and *United States v. Alexander*, 526 F.2d 161 (8th Cir. 1975). It was the trial court's opinion that

the unstipulated examination was lacking in control questions and other safeguards and appeared even less likely to have produced a credible response than those reported in the above cases.

■ Eden concedes that whether to allow polygraph evidence is clearly within the discretion of the trial court. In *United States v. Marshall, supra,* p. 1360, this court stated "... a trial court will rarely abuse its discretion by refusing to admit the [polygraph] evidence, even for a limited purpose and under limited conditions." See also *United States v. Demma,* 523 F.2d 981, 987 (9th Cir. 1975) (en banc). We see no evidence of an abuse of the trial court's discretion in refusing to allow this evidence.

5) *Did the trial court err in refusing to compel the government to present exculpatory evidence to the grand jury, including the results of a polygraph examination of the defendant?*

The only exculpatory evidence defendant refers to is the results of the polygraph examination. Relying on *United States v. Samango,* 607 F.2d 877, 884 (9th Cir. 1979) and *United States v. Owen,* 580 F.2d 365, 367 (9th Cir. 1978), Eden argues that the trial court should have required the government to present the polygraph evidence before the grand jury as an exercise of the court's supervisory power to prevent government impropriety in grand jury investigations.

This court's holding in *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978), aptly applies here, when it said:

> The grand jury need not be advised of all matters bearing on the credibility of potential witnesses. Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way, as where perjured testimony has knowingly been presented. There is nothing shocking to the conscience in the circumstances here.

■ Under this "flagrant case" standard, it is difficult to understand how it could be said that the trial court abused its discretion in refusing to compel the government

to present evidence, which at a later hearing is determined to be inadmissable.

The trial court properly refused to allow the above mentioned evidence.

6) *Was there sufficient evidence presented at trial to find the defendant guilty beyond a reasonable doubt of the offenses charged in the indictment?*

Defendant challenges the sufficiency of the evidence to sustain the conviction on all counts, specifically charging there was insufficient evidence to support a finding of criminal intent.

The relevant inquiry on review is whether "... after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Applying this standard this court must consider all of the evidence, including that offered by the defense. *United States v. Lopez,* 625 F.2d 889, 897 (9th Cir. 1980).

■ The evidence establishes that Eden was aware of the regulations governing the H.E.W. special programs since he personally signed the agreements pertaining to the same. He was aware of the fact that specific accounts existed to handle these funds separately from the school's own funds since he had established these accounts himself and was signatory thereto. He was familiar with the fact that the college was required to and did apportion the disbursement of federal funds so that a student's funds were not disbursed until the midpoint of the award period. Miss Palmer, the coordinator of financial aid at A.C.C. had advised Eden that federal funds could not be put directly into the college's general account from the various special program accounts. Miss Palmer additionally had shown Eden the regulations which required that procedure. Miss Palmer also advised Eden that about $100,000 remaining in the special accounts were required to go back to the government because all possible disbursements had been made under the programs.

The evidence clearly shows that Eden disregarded this information and deposited the special funds into one general account. The evidence clearly demonstrates that Eden then laundered much of this federal money through a general exchange program with other persons and companies.

Under these circumstances, a rational trier of fact could have found all of the essential elements of the crime established beyond a reasonable doubt including that of criminal intent.

We affirm.