John M. DOWD, Plaintiff,

v.

Samuel Ray CALABRESE, Defendant.

William M. KRAMER, Plaintiff,

v.

Samuel Ray CALABRESE, Defendant.

William M. KRAMER, Plaintiff,

v.

James A. DRINKHALL, et al., Defendants.

John M. DOWD, Plaintiff,

v.

James A. DRINKHALL, et al., Defendants.

James A. DRINKHALL, Plaintiff,

v.

William M. KRAMER, Defendant.

Nos. 80–0911, 80–3324, 80–3325 and 81–1266.

United States District Court, District of Columbia.

April 26, 1984.

See also, D.C., 577 F.Supp. 238; D.C., 101 F.R.D. 427.

Thomas C. Green, Washington, D.C., for plaintiffs.

Michael T. Kenney, Santa Ana, Cal., Michael N. McCarty, Sara E. Lister, Togo D. West, Patterson, Belknap, Webb & Tyler, Washington, D.C., Floyd Abrams, Charles A. Gilman, Cahill, Gordon & Reindel, Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, Richard L. Levie, U.S. Dept. of Justice, Civ. Div., John C. Martin, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

The Dow Jones defendants[1] request that the Court admit polygraph evidence in the forthcoming trial of this libel action. The request is opposed by plaintiffs.

According to the Dow Jones motion, *Wall Street Journal* reporter Jim Drinkhall was given two separate polygraph examinations in December 1980. The questions asked of him on these examinations related to the truth and accuracy of his interviews with plaintiffs Kramer and Dowd and with certain of his confidential sources. According to the defendants,

---

**1.** Dow Jones & Company, Inc. and Laurence G. O'Donnell will be collectively referred to herein as the Dow Jones defendants. Separate counsel have recently made an appearance on behalf of defendant Jim Drinkhall. Samuel Calabrese also has his own counsel.

both polygraph examiners concluded that Drinkhall's answers were truthful, and they ask the Court to rule that these polygraph results are admissible in evidence.

I

The Court of Appeals for this Circuit held in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), a decision widely followed in the United States, that polygraph evidence is not admissible, and that it may be admitted only if and when it is "sufficiently established to have gained general acceptance in the particular field in which it belongs."[2] Defendants claim that surveys they have commissioned demonstrate that the *Frye* test has now been met. Before examining the factual accuracy of that assertion and the information underlying it, it is appropriate to recapitulate briefly the state of the law generally on the admissibility of polygraph evidence.

The great weight of judicial authority in the United States still is, sixty years after *Frye*, as opposed to the admission of such evidence as the Court of Appeals was at that time, and for the same reasons.[3] Indeed, contrary to defendants' claim that during recent years courts have begun to rule that such evidence may be admitted,[4] the fact is that, as a leading text[5] puts it,

the trend favoring admissibility of polygraph evidence that some commentators detected a decade ago now seems to have been reversed by a number of significant state decisions.

Moreover, every single federal court of appeals which has considered the issue has ruled against admissibility[6] and the Court of Appeals for this Circuit likewise continues to adhere to the *Frye* principle.[7]

■ It is against this background that defendants' claim of the alleged reliability and general acceptance of the results of polygraph examinations in the scientific community must be evaluated.[8]

II

■ The polygraph records and measures certain involuntary bodily responses, *e.g.*, blood pressure, pulse rate, respiration, and skin resistance to electricity. The theory of polygraph examinations is that these physiological responses can be analyzed to determine the individual's subjective state of mind. Thus, acceptance of the polygraph test requires in the first instance an acceptance of two premises: (1) that there are generally-existing relationships between lying, emotions, and measurable physiological changes, and (2) that measures cannot be taken to affect these relationships. It is not clear that even these basic premises are correct.[9]

2. Other courts have held, more generally, that the acceptance of a technique or process in the scientific community is synonymous with its reliability. See, *e.g.*, *United States v. Franks*, 511 F.2d 25, 33 n. 12 (6th Cir.1975); *United States v. Alexander*, 526 F.2d 161, 163 (8th Cir.1975).

3. Few subjects have been studied as extensively in the legal literature as the polygraph. For an exhaustive discussion of the cases and the commentators, see *State v. Dean*, 103 Wis.2d 228, 307 N.W.2d 628 (1981).

4. Memorandum of Law at 13. Some of the defendants' cases approve of the admission of polygraph evidence only if the parties so stipulate (*e.g.*, *Pool v. Perini*, 659 F.2d 730, 735 (6th Cir.1981)) and others do not mandate admissibility but leave the issue to the discretion of the trial judge (*e.g.*, *United States v. Marshall*, 526 F.2d 1349 (9th Cir.1975).

5. Wright & Graham, *Federal Practice & Procedure*, § 5169 at 43 (Supp.1983).

6. See *United States v. Bando*, 244 F.2d 833, 841 (2d Cir.1957); *United States v. Alexander, supra; United States v. Cochran*, 499 F.2d 380, 393 (5th Cir.1974); *United States v. Franks, supra; Marks v. United States*, 260 F.2d 377, 382 (10th Cir. 1958). Some federal courts have indicated in dicta that such testimony may in some circumstances be admissible. See, *e.g.*, *United States v. Marshall, supra.*

7. See *United States v. Skeens*, 494 F.2d 1050, 1053 (D.C.Cir.1974).

8. Defendants, of course, bear the burden of showing that the conditions which have led to the judicial rejection of polygraph results no longer exist.

9. See Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie Detection*, 70 Yale L.J. 694, 700–02 (1961). The recent report of the Office of Technology Assessment (OTA), *Scientific Validity of Polygraph Testing: A Research*

Even if these premises are accepted, however, scientific results are still not guaranteed. The successful use of a polygraph test to produce reliable results depends, first, upon the biological and psychological makeup of the individual being examined, and second, upon the training, competence, experience, and integrity of the examiner and his conduct during the test. The examiner's analysis of the polygraph charts is based not merely on the recorded physiological measurements; it also takes prominently into account his subjective impressions of the outward behavior of the individual being examined.[10]

It is because of these intangible and subjective factors—which exist notwithstanding the polygraph's aura of scientific precision—that the courts have been reluctant to accord to polygraph test results the kind of scientific, and hence legal, acceptability that defendants are advocating in these cases.

Defendants claim that they have overcome these difficulties and objections by a survey of psychophysiologists they commissioned which was conducted by the Gallup Organization, Inc. According to that survey, 61 percent of the individuals questioned considered a professionally-administered polygraph test to be at least a "useful diagnostic tool when considered with other available information" in interpreting whether a subject is or is not telling the truth.[11] This, according to defendants, satisfies the *Frye* requirements.

In the Court's view, the results of this survey do not overcome the deficiencies which the courts have found to exist with respect to the reliability of polygraphs, for several reasons.

First. Scientific truth and the acceptability of scientific procedure are not normally established by public opinion polls. The scientific community uses entirely different methods for such purposes (*e.g.*, articles in learned journals, seminars, acceptance at institutions of higher learning). Defendants' polling shortcut cannot substitute for these time-honored procedures, which are time-honored precisely because scientific truth generally requires this kind of maturation of a consensus. See *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978) ("a determination of reliability cannot rest solely on a process of 'counting (scientific) noses.'")

Second. Polls are unreliable even as to broad issues of public opinion and policy, as recent experience with election polling has forcefully demonstrated to the chagrin of candidates and commentors. Such low reliability may not matter greatly in the context of electoral politics, for the voters will eventually make the real decisions, and these decisions will not be based on the results of a public opinion poll but on the appeals of the candidates themselves and the reporting of the candidates' activities in the media.[12] Here, by contrast, the Court is expected by defendants to make a decision to overturn decades of legal and scientific doctrine based on one poll commissioned by one party to this litigation.

Third. Defendants' poll is flawed, and it can hardly be regarded as a truly scientific, impartial test. The methodology, the questions, the tabulations, and all the other factors which do or do not impart reliability to a poll, were entirely outside the control of anyone but defendants' agents. That basic problem is not cured in the context of our adversary system by references to the integrity of these defendants and of the Gallup organization. Referring to situa-

---

*Review and Evaluation—A Technical Memorandum* (Washington, D.C.1983) at 87–90 likewise suggests that there is no physiological response unique to deception, and that such countermeasures as biofeedback, tensing of muscles, and the use of tranquilizers can affect the results.

10. See *State v. Dean, supra;* Reid & Inbau, *Truth and Deception,* (2d ed. 1977); *People v.*

*Barbara,* 400 Mich. 352, 255 N.W.2d 171, 190–93 (Mich.1977).

11. Exh. C to an affidavit attached to defendants' motion.

12. Some authorities believe that public opinion polls may also influence voters through a "bandwagon" effect, but this can hardly be achieved today by a single poll.

tions where polygraph results have been admitted pursuant to stipulation, the *Dean* court noted such stipulations encourage discussion and eventual agreement with regard not only to the general subject of the reliability of polygraph testing but also to more specific subjects such as the qualifications required of the examiner, the designation of the examiner, the phrasing of the test questions, and the specification of the condition under which the test is to be given. 307 N.W.2d at 637. Defendants' unilateral test satisfied none of these safeguards and conditions.

Fourth. Even on their own terms, the results of the Gallup poll submitted by defendants are not impressive. Two out of three of those responding to the telephone poll had never used polygraphs to determine whether an individual was telling the truth, and only 33 percent of all the respondents described themselves as "very informed" regarding polygraph testing.[13] Thus, the expertise of the body of those polled is somewhat suspect. Moreover, only 62 percent of those responding stated that they regarded polygraph tests as a useful diagnostic tool when considered with other information; 35 percent found them to have "little weight" or no usefulness.[14] That is hardly the stuff which would justify one in concluding that now, unlike in the past, polygraph test results have found broad scientific acceptability.

Fifth. It is obvious that, had the results of the polygraph examination shown that Drinkhall was not telling the truth, neither plaintiffs nor the Court or jury would have

ever heard about the examination or the results.[15] Whatever other consequences might have flowed from this peculiar method of insuring scientific objectivity, it was bound to have an impact on the state of mind with which Drinkhall approached the tests. One of the important factors that many of those who rely on polygraphs insist on is that the individual taking it should know that something real is at stake. Absent such conditions, no results of significance can be expected.[16]

The Dow Jones defendants respond that Drinkhall was under just such pressure because he knew that his employers would not take kindly to lying and that, if he did not pass the test, they would take appropriate action.[17] It would not be fair to the plaintiffs or to the search for truth in this litigation to depend on that assumption for equating the Drinkhall test with one that is taken with full knowledge of and participation by both parties. No one can know whether, had Drinkhall failed the test, he would have been subjected to consequences remotely similar to those which would have followed from his failure to pass a polygraph test conducted under impartial auspices—consequences including a possibly very large verdict against both him and his employers, with the attendant loss of prestige and credibility. The Drinkhall test was not a fair test, and even if, contrary to the Court's conclusion, polygraphs in general are valid scientifically, the results of this particular test cannot be regarded as accurate for admission into evidence.[18]

---

**13.** The remainder answered that they were somewhat, not well, or not at all informed concerning this subject.

**14.** When only those with doctoral degrees who stated that they were very or somewhat informed about polygraphs are counted, the ratio decreases further—60 percent found the tests useful, 39 percent did not.

**15.** Drinkhall was told prior to taking the tests that the results "would be reported to both him and Dow Jones." Affidavit of Rudolph Guiliano. There was no mention of the Court, jury, or plaintiffs.

**16.** *Lhost v. State*, 85 Wis.2d 620, 271 N.W.2d 121, 131–32 (1978), quotes a leading text to the

effect that "a suspect's fear of detection is the major factor in assuring his physiological response while lying. It is precisely this aspect of the situation which is most dramatically altered when the polygraph is employed by the defendant's attorney."

**17.** Reply Memorandum at 12–13.

**18.** Defendants rely on the use of polygraph examinations by government and business in security and similar types of investigations. Memorandum at 12–13. The Court, of course, does not pass upon the issues surrounding such uses. It may be that in such circumstances the intimidation factor alone is sufficient to provide

Defendants would use the results of one flawed instrument—the public opinion poll—to validate the scientific acceptability of another flawed instrument—the polygraph. That will not do.

### III

There is a second major obstacle to the use of polygraph tests as evidence in judicial proceedings. A considerable number of courts have held that public policy reasons militate against the admission into evidence even of scientifically-validated polygraph results because such results are likely unduly to sway the jury.[19] These courts suggest that the relevance of the polygraph results is outweighed by the possibility that the jury will be misled, prejudiced, and indeed displaced by the polygraph and its operators.

This Court endorses the observation of Chief Judge Gibson for the Eighth Circuit in *United States v. Alexander, supra,* 526 F.2d at 169, to the effect that

> The jury institution was created and maintained due to the public reluctance 'to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges .... However, in many cases where polygraph evidence is admitted, a single person, the polygraphists, will give testimony which will often be the determinative factor as to the guilt or innocence of a defendant in a jury-tried case. This would deprive the defendant of the common sense and collective judgment of his peers, derived after weighing facts and considering the credibility of witnesses, which had been the hallmark of the jury function.

(footnote omitted).

Defendants recognize the danger that the jury will give undue credence to the machine (and its human operator), and on that issue, too, their answer is a Gallup poll. In December 1982, the Gallup organization interviewed by telephone 1,004 potential District of Columbia jurors. 15 percent of those questioned stated that they would pay more attention to polygraph results than to the testimony of a witness,[20] 11 percent responded that they would ignore the polygraph results, and 72 percent stated that they would pay greater attention to what the witness said but would also consider carefully the polygraph results. Defendants argue on the basis of the fact that 72 percent gave what they regard as the "common sense answer" there is no danger that the jury would be unduly influenced or swayed. That conclusion is likewise unpersuasive.

One clue to the difficulty is precisely that 72 percent gave the "common sense answer." No one with any common sense would, when interviewed by a polling organization, give anything but the answer that he would consider both the witness and the polygraph. Indeed, almost any person would be embarrassed to state that, if called to jury duty, he would give greater weight to a machine than to a witness. It is, however, an enormous leap from an answer given to a telephone inquiry by a poll-taker to the conclusion that the same individual, after sitting as a juror for six to ten weeks, would not decide that the machine was more trustworthy than the confusing stories of several dozen witnesses.

The credibility of Jim Drinkhall shapes up as a crucial issue in this action. It appears that on many issues it will be his word against that of others, and the surrounding circumstances are likely to be confused and confusing. If the Court were to admit the polygraph evidence, defendants could be expected to hammer home to the jury that the machine was the best, the only way out of the human contradictions, and that, indeed, the jury would be derelict in its duties were it to reject the machine's

results which are acceptable to the managers of these programs.

**19.** See, *e.g., State v. Catanese,* 368 So.2d 975, 981–82 (La.1979) and cases and comments there cited.

**20.** This group includes those who stated that they would only consider only the polygraph, to the exclusion of the witness' testimony.

verdict. In short, in significant measure, trial by machine would replace trial by jury.[21] The polygraph is not scientifically reliable. Yet there is here a real danger that, notwithstanding the lack of reliability, it (or rather its operators) will be the real finders of fact in this case.

### IV

For the reasons stated, defendants' motion to admit polygraph evidence will be denied, first because as a matter of law and precedent in this jurisdiction such evidence is not admissible and second, because, if the Court has discretion, it concludes that the scientific reliability of such evidence is substantially outweighed by its confusing effect on the jury. See Rule 403, F.R.Evid.

---

**21.** Defendants are thus in somewhat of a dilemma: they argue, on the one hand, that polygraph evidence is reliable, and on the other, that it will not influence the jury very much.