**Robert J. BROWN, Plaintiff-Appellant,**

v.

**John F. DARCY, a/k/a Jack Darcy, an individual; Ducommun, Inc., a corporation, Defendants-Appellees.**

No. 83–6440.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1985.

Decided March 4, 1986.

James L. Seal, Swerdlow, Miller, Seal & Swerdlow, P.C., Beverly Hills, Cal., for plaintiff-appellant.

Richard Levy, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants-appellees.

Before HUG and HALL, Circuit Judges, and JAMESON,[*] District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

■ Polygraph evidence has been disfavored in the federal courts since the decision of the District of Columbia Circuit in *Frye v. United States*, 293 Fed. 1013 (D.C. Cir.1923).[1] Despite advances in polygraphy since the *Frye* decision, there are still significant questions regarding the reliability of polygraph examinations. Polygraph evidence also presents problems for our adversarial system because it has an overwhelmingly prejudicial effect when it is inaccurate, interferes with the jury's authority to determine credibility, and imposes a burden on district courts to review the reliability of polygraph evidence in each case. Accordingly, we hold that polygraph evidence may not be admitted to establish the truth of statements made during the polygraph examination unless the parties have stipulated to the admissibility of the polygraph results before the examination is administered, and the court is satisfied that the examination has been administered in a manner which supports the reliability of the polygraph results.

## BACKGROUND

Plaintiff-appellant Robert J. Brown appeals from a jury verdict in favor of defendants John F. Darcy and Ducommun, Inc. on his complaint for libel and slander. At the time this dispute arose Brown was a Corporate Vice President and Director of Sales and Marketing-West for Motorola, Inc. Brown was also one of seven members of Motorola's Distributor Council, the body responsible for Motorola franchising decisions. Darcy was President of Kierulff Electronics, a wholly-owned subsidiary of Ducommun. Kierulff Electronics was a distributor of electronic components, including Motorola parts, and held Motorola franchises in eight cities throughout the United States. Kierulff Electronics was interested in obtaining Motorola franchises in eight additional locations. Motorola franchises are valuable to distributors of electronic components because franchisees are permitted to buy Motorola parts at a discount, and receive sales assistance from Motorola field personnel.

This dispute revolves around a May 15, 1980 meeting at the Radisson Hotel in Scottsdale, Arizona, among Brown, Darcy, and Donald Fullam, a Motorola executive with responsibilities similar to Brown's and also a member of Motorola's Distributor Council. According to Darcy, Brown and Fullam solicited a bribe from him at the meeting, asking him for $200,000 in return for Brown's and Fullam's efforts to lobby the Distributor Council to approve the additional franchises Kierulff Electronics was seeking. Brown maintains that the meeting was a legitimate discussion of Kierulff Electronics' record in existing franchises and the possibility of obtaining further franchises. According to Brown, Darcy at one point inquired whether Brown and Fullam were soliciting a bribe in exchange for their help in getting franchises, but Brown claims that he did not take Darcy seriously because such action would be a clear violation of Motorola policy. Brown remembers Fullam responding to Darcy's inquiry by describing a bribe that had been paid to another electronics company, but Brown claims that he directed the conversation

---

[*] Hon. William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

[1]. The *Frye* court held:
We think the systolic blood pressure deception test [a predecessor of the modern polygraph] has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.
293 Fed. at 1014.

back to Kierulff Electronics' eligibility for new franchises based on its past performance.

Darcy returned to Los Angeles after the meeting, and consulted with Ducommun's President, Wallace Booth, and Ducommun's legal counsel, Arthur Schmultz. Acting on their advice, Darcy decided to wait and see what would happen rather than contact Motorola about the alleged solicitation.

In July 1980 Darcy was contacted by three different people in the electronics business who informed Darcy that Fullam was claiming that Darcy owed him a substantial sum of money. One of these individuals put Darcy in contact with Alfred Stein, Assistant General Manager of the Semiconductor Group at Motorola. Darcy recounted his version of the Radisson Hotel meeting for Stein, and later for Stein and Richard Weise, Motorola's General Counsel. During this second meeting Darcy provided a written statement and volunteered to take a polygraph test to support his accusations. The written statement summarized Darcy's version of the Radisson Hotel meeting, including his claim that Brown and Fullam had solicited a pay-

ment in exchange for lobbying efforts on behalf of Kierulff Electronics. Darcy's written statement also indicated that "[o]ver the course of the evening, [Darcy] consumed three glasses of 7–UP and Brown and Fullam accounted for the balance of a $33.00 bar bill," and that while "walking from the cocktail lounge to the parking lot [Brown and Fullam] repeatedly made insulting remarks with respect to [Darcy's] stupidity and lack of understanding as to what it took to be successful in business." At trial Darcy testified that he had orally informed Stein and Weise that Fullam attributed Brown's involvement in the solicitation scheme to Brown's need to pay off substantial gambling debts.

The polygraph examination [2] which Darcy agreed to take in support of his accusations against Brown was administered by Cy Gilson [3] on September 9, 1980. The control questions employed by Gilson were criticized by some of the other polygraph experts. [4] Gugas found that the control questions were inappropriate because they were not sufficiently related to the subject which was being investigated and concluded that Darcy's truthfulness could not be

---

**2.** Modern polygraph instruments measure blood pressure, pulse, respiration, and galvanic skin reflex. *See* Reid & Inbau, *Truth and Deception, The Polygraph ("Lie-Detector") Technique* 5–6 (2d ed. 1977); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System*, 26 Hastings L.J. 917, 921–22 (1975). Polygraphy is based on the theory that the stress of lying creates physiological responses which can be detected by monitoring these four factors. Tarlow, *supra*, at 921–22; Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection*, 70 Yale L.J. 694, 699–703 (1961). In a zone of comparison polygraph test, such as those used in this case, the subject is asked a "control question" designed to elicit an untruthful response. Reid & Inbau, *supra* at 28–30; Tarlow, *supra* at 921–22 & n. 35. This lie will give the examiner feedback which will be used for comparison when the subject is asked questions regarding the subject under investigation, known as "relevant questions." If the subject is telling the truth in response to the relevant questions, the physiological response should be less significant than the response measured when the control question is answered. Reid & Inbau, *supra* at 29.

**3.** Gilson, a polygraph examiner for the Arizona Department of Public Safety, testified that he has conducted approximately 6,000 polygraph examinations since he was trained at the Bachelor School of Lie Detection in 1971.

**4.** Brown presented documentary evidence and trial testimony by Chris Gugas, a polygraph examiner for thirty years and past President of the American Polygraph Examiners Association, and Frank S. Horvath, an associate professor of criminology at Michigan State University licensed in polygraphy since 1965 and also currently serving as research director at John E. Reid and Associates. Darcy presented expert testimony through Clarence Kirkland, who was trained in polygraphy at Texas A & M in 1978 and has served as an instructor at the Los Angeles Institute of Polygraphy, and Cy Gilson. The district court also appointed its own expert, Alvin Burdick, an examiner since 1971 and formerly employed as such by the Los Angeles Police Department and the United States Postal Service.

evaluated because of this defect.[5] The control questions were also disapproved of by Horvath because they were prefaced by the phrase "Did you honestly believe ... ?" This type of control question is ineffective because it tests what the examinee believed, not what actually happened.[6] In spite of these problems Gilson concluded that Darcy was telling the truth about the Radisson Hotel meeting.

On September 10, 1980, investigators from Motorola informed Brown of the accusations by Darcy and told Brown that Darcy had passed a polygraph examination. Brown submitted a written statement contradicting Darcy's accusations within two days, and agreed to submit to a polygraph test. The test was scheduled to be administered by Cy Gilson. Brown initially objected because Gilson had already opined that Darcy was telling the truth, but eventually consented to the examination by Gilson on September 12, 1980. Gilson found the Brown test results inconclusive. The Brown test was criticized by Horvath and Gugas because it was unlikely that Gilson could establish the rapport with Brown necessary to a successful polygraph examina-

tion.[7] Gugas also stated that he would not have administered the polygraph examination to Brown on September 12 if he had known that Brown was suffering from emphysema and had experienced two relatively sleepless nights since being informed of Darcy's accusations, because respiratory problems and high stress levels will affect the accuracy of a polygraph examination.[8] At trial Horvath testified that no opinion could validly be drawn regarding Brown's truthfulness or deceptiveness because the theft control questions were not relevant to the subject under investigation, too narrowly drawn, and may not have elicited the necessary untruthful response.

After Brown filed his motion to exclude the polygraph evidence, defendants arranged for a second examination of Darcy by Clarence Kirkland. Defendants did not inform the court or Brown of the examination until they knew that Kirkland had concluded that Darcy was telling the truth. The reliability of the Kirkland examination is questionable because it was not administered until December 1982, more than thirty months after the Radisson Hotel meet-

---

5. Specifically Gugas stated:

The theft control questions actually asked are not close to the present matter, and these questions did not elicit the type of significant reaction needed from Mr. Darcy because it is possible that Mr. Darcy was in no position to steal anything from his employers. Regardless of these two theft control questions, they did not give enough response to score Darcy's charts as truthful. The importance of a good control question cannot be overemphasized, since it is the heart of the scoring technique and visual observation by the examiner.

....

[T]he lack of sufficient valid control questions propounded to Mr. Darcy by Mr. Gilson renders highly suspect any conclusion expressed by Mr. Gilson as to either the truthfulness or falsity of Mr. Darcy's responses to the relevant questions

....

6. *See* Reid & Inbau, *supra* note 2, at 26 (relevant questions should be directed at factual information; they should not evoke a response based on the subject's opinion).

7. Horvath noted that one examiner may choose to examine more than one subject in an investigation, but explained that the examiner should

not render an opinion on truthfulness until after both subjects have been examined. Mr. Gugas summarized the problem as follows:

In administering a polygraph examination, the examiner must take steps to make sure that the examinee has confidence in the examiner and in the process of the examination. Prior to the examination, the examiner works with the examinee to formulate the questions and to assure the examinee that no other questions will be asked. At all times, the examiner attempts to obtain and maintain the confidence of the examinee in him. If the examinee lacks confidence in the integrity and ability of the examiner, the results of an examination of that examinee are highly suspect. Where an examinee is told that the polygraph examiner has already formed the opinion that a person contradicting the examinee is being truthful, the examinee is likely to lose all confidence in the examiner, thus rendering any examination results to be [sic] unreliable.

8. *See* Highleyman, *The Deceptive Certainty of the "Lie Detector"* 10 Hastings L.J. 47, 60 (1958) (respiratory disorders and extreme emotional tension can affect realiability of polygraph results).

ing. The lapse of time between the events in question and the polygraph examination increases the likelihood that the subject will convince himself that certain statements are true, and therefore not produce the physiological responses associated with lying.[9]

Before trial Brown moved to exclude all of the polygraph examinations. Alvin Burdick, the court-appointed expert,[10] concluded that the Darcy examination administered by Gilson was reliable, and agreed with Gilson's conclusion that Darcy was telling the truth. Burdick also concluded that Brown was attempting to beat the polygraph examination which Gilson found inconclusive, and supported Kirkland's conclusion that Darcy was telling the truth during his second examination. After reviewing the conflicting expert opinions and hearing argument from counsel the district judge concluded:

> It appears to me that, as far as the law is concerned, I have no question regarding reliability. Anything further, the factual nature of it, can be argued to the jury, much as you have argued it here to me today.

The jury returned a verdict for defendants, and the district judge denied Brown's motion for new trial, indicating that he agreed with the jury's verdict and that, in his opinion, the polygraph evidence "was almost irrelevant in terms of reaching the decision that was reached." Brown filed a timely appeal.

## ANALYSIS

On appeal Brown argues that the district court erred in admitting the polygraph evidence, and that the court should have instructed the jury that Darcy's statements to Motorola regarding the bar bill, Brown's alleged gambling debts, and Brown's allegedly intimidating behavior could be considered as independent libels or slanders and therefore independent grounds for recovery.

## I. POLYGRAPH EVIDENCE

 We have consistently expressed an inhospitable view towards the admission of unstipulated polygraph evidence under the Federal Rules of Evidence. *See, e.g., United States v. Givens*, 767 F.2d 574, 585–86 (9th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985); *Demma*, 523 F.2d at 987.[11] We have found no Unit-

---

**9.** *See* Reid & Inbau, *supra* note 2, at 228. *See also United States v. Demma*, 523 F.2d 981, 987 (9th Cir.1975) (en banc) ("probative force of the [polygraph] evidence diminished by the lapse of time between the occurrence of the events and the taking of the test").

**10.** *See supra* note 4.

**11.** We have reviewed district court decisions refusing to admit polygraph evidence on at least eighteen occasions and never found an abuse of discretion. *Givens*, 767 F.2d at 585–86; *United States v. Johnson*, 735 F.2d 1200, 1203 (9th Cir. 1984); *United States v. Falsia*, 724 F.2d 1339, 1341–42 (9th Cir.1983); *United States v. Ferris*, 719 F.2d 1405, 1408 (9th Cir.1983); *United States v. Eden*, 659 F.2d 1376, 1382 (9th Cir. 1981) (trial court did not err in refusing to compel presentation of exculpatory polygraph evidence before grand jury), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982); *United States v. Glover*, 596 F.2d 857, 867 (9th Cir.), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. McIntyre*, 582 F.2d 1221, 1226 (9th Cir.1978); *United States v. Radlick*, 581 F.2d 225, 229 (9th Cir. 1978); *United States v. Benveniste*, 564 F.2d 335,

338–39 (9th Cir.1977); *United States v. Flores*, 540 F.2d 432, 436–437 (9th Cir.1976); *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir.), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976); *Demma*, 523 F.2d at 987; *United States v. Watts*, 502 F.2d 726, 728 (9th Cir.1974); *United States v. Bagsby*, 489 F.2d 725, 726–27 (9th Cir.1973); *United States v. Alvarez*, 472 F.2d 111, 113 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *United States v. Jenkins*, 470 F.2d 1061, 1064 (9th Cir.1972), *cert. denied*, 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *United States v. Salazar-Gaeta*, 447 F.2d 468, 469 (9th Cir.1971); *United States v. Sadrzadeh*, 440 F.2d 389, 390 (9th Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 88 (1971). In *Marshall* we specifically concluded that "[w]ith the polygraph's misleading reputation as a 'truth teller,' the widespread debate concerning its reliability, the critical requirement of a competent examiner and the judicial problems of self-incrimination and hearsay, a trial court will rarely abuse its discretion by refusing to admit the evidence, even for a limited purpose and under limited conditions." 526 F.2d at 1360.

In the only decision in which we have affirmed the admission of polygraph evidence of-

ed States Court of Appeals decision which has affirmed the admission of unstipulated polygraph evidence under the Federal Rules of Evidence, *see Dowd v. Calabrese*, 585 F.Supp. 430, 431 (D.D.C.1984); *see generally* Annot., 43 A.L.R.Fed. 68 (1979), or concluded that the refusal to admit polygraph evidence at trial was an abuse of discretion, *see United States v. Williams*, 737 F.2d 594, 611 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). At least five other Courts of Appeals have held that unstipulated polygraph evidence is *per se* inadmissible. *Poole v. Perini*, 659 F.2d 730, 735 (6th Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 450 (1982); *United States v. Alexander*, 526 F.2d 161, 163–70 (8th Cir.1975); *United States v. Cochran*, 499 F.2d 380, 393 (5th Cir.1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 810, 42

L.Ed.2d 825 (1975); *United States v. Skeens*, 494 F.2d 1050, 1053 (D.C.Cir.1974); *Marks v. United States*, 260 F.2d 377, 382 (10th Cir.1958), *cert. denied*, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959). Given the questionable reliability of polygraph evidence and the great potential for prejudice from inaccurate polygraph evidence, we conclude that unstipulated polygraph evidence is inadmissible as technical or scientific evidence under Fed.R.Evid. 702 because it does not "assist the trier of fact to understand the evidence or to determine a fact in issue."

The questionable accuracy of polygraph examinations is the most persuasive reason for excluding polygraph evidence. Estimates on the reliability with which polygraph examinations predict whether the examinee is telling the truth range from seventy percent to ninety-five percent.[12]

---

fered to establish the truth of the statements made during the examination the parties stipulated to admissibility before the polygraph was administered. *Herman v. Eagle Star Ins. Co.*, 396 F.2d 427 (9th Cir.1968). On two other occasions we noted the presence of polygraph evidence in the record when the issue of admissibility was not before us, *United States v. Estrada-Lucas*, 651 F.2d 1261, 1263–65 (9th Cir.1980); *United States v. Murray*, 492 F.2d 178, 189 (9th Cir.1973), *cert. denied*, 419 U.S. 942, 95 S.Ct. 210, 42 L.Ed.2d 166 (1974), and on one occasion we indicated that admission of polygraph evidence on remand would not necessarily be an abuse of discretion, *Benveniste*, 564 F.2d at 339 n. 3.

**12.** *See* Inbau & Reid, *Lie Detection and Criminal Interrogation* 111–12 (3d ed. 1953) (estimating 95% accuracy in 4,280 criminal investigations over five years); Holmes, *The Degree of Objectivity in Chart Interpretation, reprinted in* II *Academy Lectures in Lie Detection*, 62, 62–70 (1958) (75% accuracy estimate); Hunter & Ash, *The Accuracy and Consistency of Polygraph Examiners' Diagnosis*, 1 J. Pol.Sci. & Admin. 370, 372 (1973) (86% accuracy achieved by seven examiners in controlled study); Sternbach, Gustafson, & Colier, *Don't Trust the Lie Detector*, 127, 130 Harv.Bus.Rev., (Nov.-Dec. 1962) (70% accuracy estimate). Accuracy is lower for individual questions than for overall conclusions regarding truthfulness. *See* Horvath & Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception*, 62 J.Crim.L., C., & P.S. 276, 278–80 (1971) (overall accuracy 88% in controlled study by ten examiners; per question accuracy of 79%); Hunter & Ash, *supra*, at 372 (overall accuracy 86%, per question accuracy of

82%). Inexperienced examiners are less accurate in their evaluations than experienced examiners, see Horvath & Reid, *supra*, at 279 (examiners with less than six months experience were 12% less accurate in overall predictions of truth than experienced examiners in controlled study), and the same examiner may reach different conclusions regarding truthfulness when reviewing the same examination results on two different occasions, see Hunter & Ash, *supra*, at 372 (examiners achieved only 85% consistency in overall determinations of truth and deception and 80% consistency in rating individual questions with lapse of at least three months between interpretations).

These accuracy figures may be inflated. The Inbau & Reid study claiming 95% accuracy has been criticized because the determinations of accuracy was based on a comparison between polygraph results and trial outcomes or confessions. Sternbach, Gustafson & Colier, *supra*, at 130. Such an approach assumes the accuracy of polygraph determinations which coincide with trial outcomes. Only forty-eight percent of the cases in the Inbau & Reid study were actually verified by confession or other corroborative evidence. *Id.* The controlled studies inflate accuracy figures because they protect against errors in the formulation of questions and physical problems of the examinee among other variables. Even Reid & Inbau, the primary proponents of polygraphy in the United States, admit these difficulties:

In many case investigations involving the use of the Polygraph technique, the truth or falsity of the examiner's findings is never factually established by subsequent events or disclosures. Proof is often lacking, therefore, as to

These reliability estimates are further complicated by the number of factors which affect the reliability of polygraph examinations in any particular case.

> The reliability of polygraph evidence is widely debated. *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir.1975), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976). Multiple variables may influence the results of a polygraph test, including the motivation of the subject, his physical and mental condition, the competence, integrity, and attitude of the operator, the wording of the relevant questions, the appropriateness of the control questions, and the interpretation of the resulting graph.

*Givens*, 767 F.2d at 585. *See also Alexander*, 526 F.2d at 165–66. In this case, for example, experts Horvath and Gugas doubted the validity of the control questions asked during the Darcy examination administered by Gilson, and the propriety of having Gilson examine Brown after he had rendered an opinion that Darcy was telling the truth.

The overwhelming potential for prejudice when incorrect polygraph evidence is introduced to a jury also supports our conclusion that polygraph evidence is *per se* inadmissible. As the Eighth Circuit has noted:

> When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the evidentiary foundation at trial, the polygraphist will present his own assessment of the test's reliability which will generally be well in excess of 90 percent.... Based upon the presentment of this particular form

of scientific evidence, present-day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful in his response to a question bearing on a dispositive issue....

*Alexander*, 526 F.2d at 168. *See also Falsia*, 724 F.2d at 1342 (noting polygraph's "misleading appearance of accuracy"); *Marshall*, 526 F.2d at 1360. Even if the accuracy of polygraph examinations approaches the eighty percent or ninety percent claimed by the polygraph experts, this view of the polygraph as an absolute indicator of truth creates an overwhelming potential for prejudice when inaccurate results are introduced.[13] *See Marshall*, 526 F.2d at 1360 (potential prejudice is one aspect district court may consider in refusing to admit polygraph evidence).

The introduction of polygraph evidence also infringes on the jury's role in determining credibility. Our adversary system is built on the premise that the jury reviews the testimony and determines which version of events it believes. Allowing a polygraph expert to analyze responses to a series of questions and then testify that one side is telling the truth interferes with this function. *See Alexander*, 526 F.2d at 168; *see also Dowd*, 585 F.Supp. at 434. Polygraph evidence is different from other scientific evidence such as ballistics, fingerprints, or voice analysis, because it is an opinion regarding the ultimate issue before the jury, not just one issue in dispute. *Alexander*, 526 F.2d at 169. Providing the jury with an all or nothing evaluation of

---

whether the examiner in any given case was right or wrong. Nor can the accuracy of the Polygraph technique be determined in a psychology laboratory setting or by the use of fictitious crimes under other testing circumstances. This limitation prevails for the simple reason that it is practically impossible to simulate conditions comparable to those involved in actual case situations.
Reid & Inbau, *supra* note 2, at 304.

**13.** Our conclusion that unstipulated polygraph evidence is *per se* inadmissible is the same

whether we examine the usefulness of the polygraph evidence to the jury under Fed.R.Evid. 702, or undertake the more traditional relevance and prejudice analysis of Fed.R.Evid. 401 and Fed.R.Evid. 403. The questionable reliability of polygraph evidence undermines its relevance, and the potential prejudice, time consumption and confusion caused by the introduction of polygraph evidence outweigh its probative value. *See Falsia*, 724 F.2d at 1342.

credibility and then telling the jury that this evaluation has an eighty percent to ninety percent chance of being accurate if the polygraph was properly administered interferes with, rather than enhances, the deliberative process.

We also note the conservation of district court resources which will be achieved by creating a *per se* rule limiting the admission of unstipulated polygraph evidence. *See Falsia,* 724 F.2d at 1341 (time consumption involved in evaluating reliability of polygraph evidence is proper consideration for court in refusing to admit such evidence); *Marshall,* 526 F.2d at 1360 (same). In this case the district court reviewed the opinions of five polygraph experts and heard oral argument before ruling that the polygraph evidence was admissible. The jury then heard roughly two full days of testimony from polygraph experts in an eight day trial. Detailed case by case inquiries into the reliability of polygraph evidence such as this will not be necessary under the bright line rule that we adopt today.

■ Darcy argues that the polygraph examinations of Brown and Darcy conducted by Gilson are operative facts in this dispute because they were administered before this action was filed, making the examinations admissible in this case even if polygraph evidence is generally inadmissible under the Federal Rules of Evidence. We disagree. When a polygraph examination is an operative fact evidence of the examination is admissible. *See, e.g., Thorne v. City of El Segundo,* 726 F.2d 459, 469–71 & n. 11 (9th Cir.1983) (admitting polygraph questions into evidence in action by employee against employer and polygraph examiner for sexual discrimination in firing and in administration of the polygraph), *cert. denied,* —— U.S. ——, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *Smiddy v. Varney,* 665 F.2d 261, 265 (9th Cir.1981) (polygraph evidence admitted when polygraph examination of defendant was cause

of unlawful arrest of plaintiff), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). A polygraph examination, however, is not an operative fact simply because it is administered before the cause of action is filed. The key inquiry is for what purpose the polygraph is being introduced. If the polygraph evidence is being introduced because it is relevant that a polygraph was administered regardless of the results, or because the polygraph examination is the basis of the cause of action as in *Thorne* or *Smiddy,* then the polygraph evidence may be admissible as an operative fact.[14] If, on the other hand, the polygraph evidence is offered to establish that one party's version of the events is the truth, the polygraph evidence is being introduced for its substantive value and is inadmissible absent a stipulation between the parties prior to administration of the polygraph.

■ The polygraph evidence is not admissible in this case as an operative fact. Darcy offered the polygraph evidence because it supports his version of the Radisson Hotel meeting, and ultimately his claim that his statements to Motorola are not libelous or slanderous because they are true.

Darcy also argues that, even if the introduction of the polygraph evidence was in error, any error was harmless. An error is harmless if "the jury's verdict is more probably than not untainted by the error." *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983). In this case the polygraph evidence consumed approximately one fourth of the entire trial, and all of the experts testified that the polygraph is roughly ninety percent accurate when administered correctly. Under these circumstances introduction of the polygraph evidence was not harmless error.

## II. LIBEL AND SLANDER CLAIMS

■ The district court declined to instruct the jury that Darcy's statements regarding the bar bill, Brown's abusive be-

---

**14.** Even when polygraph evidence is offered for these limited purposes the trial court must determine that the probative value of the poly-

graph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence. *See supra* note 13.

havior, and Brown's gambling debts could be considered as independent grounds for recovery. Whether a statement is reasonably susceptible of defamatory meaning is a question of state law, *Forsher v. Bugliosi*, 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716 (1980); *Selleck v. Globe International*, 166 Cal.App.3d 1123, 1132, 212 Cal.Rptr. 838 (1985), which we review *de novo*. *In re McLinn*, 739 F.2d 1395, 1400 (9th Cir.1984).

False statements which injure a person in his occupation can support a claim for libel or slander under California law. Cal. Civ.Code §§ 45, 46. "It is error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning." *Selleck*, 166 Cal.App.3d at 1131, 212 Cal.Rptr. 838 (citing *Cameron v. Wernick*, 251 Cal.App.2d 890, 60 Cal.Rptr. 102 (1967)). In determining whether a statement is capable of defamatory meaning we place ourselves in the position of the reader or hearer, considering the statement as a whole and the context in which the statement is made. *Selleck*, 166 Cal.App.3d at 1131, 212 Cal. Rptr. 838 (citing *MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536, 546–47, 343 P.2d 36 (1959)).

■ Applying these rules we find that the district court erred in refusing to instruct the jury that Darcy's written statements regarding the bar bill, Brown's intimidating behavior, and Darcy's oral statement regarding Brown's gambling debts could be considered as a basis of recovery. Although these statements are less damaging to Brown than Darcy's claim that Brown solicited a bribe, these statements

could rationally be interpreted as injurious to Brown's business reputation in the context in which they were made.[15]

REVERSED and REMANDED.

JAMESON, District Judge, dissenting:

I respectfully dissent.

The majority opinion correctly recognizes that both this court and the district courts have viewed the admission of polygraph evidence with disfavor. *United States v. Demma*, 523 F.2d 981, 987 (9th Cir.1975) (en banc) noted that, "Our circuit has been inhospitable to contentions that a district court has abused its discretion in refusing to admit polygraphic evidence." On the other hand, prior decisions of this court have also firmly established the district court's broad discretion to admit or exclude polygraph evidence at trial. *See, e.g., United States v. Givens*, 767 F.2d 574, 585 (9th Cir.) ("broad discretion to include or exclude polygraph evidence"), *cert. denied*, —— U.S. ——, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985); *United States v. Falsia*, 724 F.2d 1339, 1341 (9th Cir.1983) ("The precedent is clear. . . . [A]dmission or exclusion of the evidence is in the sound discretion of the district court."); *United States v. Ferris*, 719 F.2d 1405, 1408 (9th Cir.1983) ("admission of polygraph testimony is within the discretion of the trial court"); *United States v. Eden*, 659 F.2d 1376, 1382 (9th Cir.1981) ("whether to allow polygraph evidence is clearly within the discretion of the trial court"), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1405, 71 L.Ed.2d 663 (1982); *United States v. Estrada-Lucas*, 651 F.2d 1261, 1264–65 (9th Cir.1980) (admitted polygraph evidence so as not to deviate from the law of the case); *United States v. McIntyre*,

---

**15.** Darcy argues that the district court did not err in refusing to submit the above issues to the jury because they were not included in the first amended complaint or the pretrial conference order. *See* Fed.R.Civ.P. 16(e). The first amended complaint and the pretrial conference order address Darcy's written statement and Darcy's oral statements regarding Brown's allegedly intimidating behavior. Although the complaint does not refer to Darcy's oral statements regarding Brown's alleged gambling debts, the pretrial conference order does list the falsity of Darcy's

oral representations as a fact at issue, and includes the question of whether Motorola officers became concerned that Brown's gambling debts would interfere with his job performance. On remand the district court may wish to allow amendment of the complaint and the pretrial conference order to coincide with the evidence presented at the first trial. *See* Fed.R.Civ.P. 15. *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1982) (leave to amend should be freely given).

582 F.2d 1221, 1226 (9th Cir.1978) ("wide discretion ... in admitting or excluding polygraphs"); *United States v. Benveniste*, 564 F.2d 335, 339 n. 3 (9th Cir.1977) ("This is not to say that admission of such testimony would have been improper. At a new trial, admission of ... the polygraph results ... will again be within the discretion of the trial court.") *United States v. Marshall*, 526 F.2d 1349, 1360 (9th Cir.) ("polygraph tests may be admissible"), *cert. denied*, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976); *United States v. DeBetham*, 470 F.2d 1367, 1368 (9th Cir.1972) ("We do not hold that polygraphic evidence is never admissible"), *cert. denied*, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973).

In my opinion the district court did not abuse its discretion in admitting the polygraph evidence. The court gave careful consideration to Brown's motion to exclude the evidence, holding two hearings, considering numerous briefs, and receiving the testimony of five experienced expert polygraph witnesses—two on behalf of each of the parties, and one appointed by the court following the first hearing. The court relied heavily upon the court appointed expert, Alvin Burdick. Burdick advised the court:

> Upon reviewing all of the polygrams of the Darcy examination, it appears that adequate criteria exists to form an opinion that Mr. Darcy was truthful to the relevant questions, particularly when he states that he did not lie to any of the facts in his signed affidavit about Fullam and Brown's conversation with him at the Radisson Hotel in Arizona. Overall, it would appear that these polygrams have a fairly high reliability factor and that the chance for error is minimal.

and,

> The three charts produced during [Brown's] examination have one over-

riding characteristic. They all manifest apparent attempts on the part of the subject to beat the examination, or at least confuse the examiner. To argue that this examination was invalid because it was given under adverse conditions, that the subject was under considerable stress or suffered from a physical ailment are arguments that at times may be valid but not in the instant case. In spite of Mr. Brown's apparent attempt to beat the polygraph examination, there is graphic deception criteria present at the relevant questions.... It is [my] opinion that reliability of this examination is quite high and there is little probability of error.

Three of the experts vouched for the reliability of Brown's and Darcy's polygraph results. All experts testified that, administered properly, polygraph results prove highly accurate. Accuracy estimates, as noted by the majority, range from 70% to 95%, most estimates fall within the high 80% bracket.[1]

Introduction of the polygraph evidence at trial did not unduly infringe upon the jury's role in determining credibility. Each expert was subject to cross-examination concerning his opinion. No expert testified that polygraph examinations were infallible. The trial record discloses disagreement between the qualified experts. The jury could either believe the testimony of the three experts finding the polygraphs reliable, or the testimony of the other two experts questioning reliability of the polygraphs in this case. The jury was never confronted with an "all or nothing" choice.[2]

Notably, the initial polygraph examinations of both Darcy and Brown were not administered in preparation for trial.

---

1. Counsel laid an adequate foundation. In addition to testimony concerning the reliability of polygraphs in general, the experts testified that Cy Gilson was a qualified examiner, used a proper instrument, and administered an accepted zone of comparison test.

2. In addition to the testimony of the five expert witnesses, either by deposition or at trial, 22

other witnesses testified at trial. The transcript consists of over 2,000 pages, of which approximately one-fourth consisted of the testimony of the polygraph experts. The district court observed: "The matter of the polygraphs on both sides ... was almost irrelevant in terms of reaching the decision that was reached."

Rather, the polygraph examinations formed part of the operative facts of this case. Darcy volunteered to take a polygraph test following his written report to Motorola on the May 15, 1980 meeting. Motorola then interviewed Brown and Fullam. Following its interview with Brown, Motorola arranged for Gilson to administer a polygraph examination. Motorola based its decision to terminate Brown on the results of both polygraph examinations.[3] As in *Thorne v. City of El Segundo,* 726 F.2d 459 (9th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984), and *Smiddy v. Varney,* 665 F.2d 261 (9th Cir.1981), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982),[4] cited in the majority opinion, the polygraph examinations were administered prior to an event (Brown's termination), the explanation of which was critical to this case. It is impossible without evidence of the taking of the polygraphs to place the statements of Darcy, Brown, and Fullam in proper perspective. Absent admission of the polygraph results, the jury would obtain a distorted and incomplete view of the parties' conduct. Moreover, the results of the polygraph test administered to Darcy by Gilson provided probative evidence that Darcy believed his statement to be true, an essential element in defending Brown's action for libel and slander. Thus, the polygraph examinations, in my opinion, became an inextricable part of the events forming the basis of Brown's suit, and the district court did not abuse its discretion in admitting the polygraph evidence.

Nor do I believe that the court erred in refusing to instruct the jury that Darcy's statements concerning the bar bill, Brown's abusive manner, and Brown's gambling debts provided independent grounds for recovery. As noted in the majority opinion, the defamatory nature of these remarks presents a question of state law reviewable de novo. *Forsher v. Bugliosi,* 26 Cal.3d 792, 803–05, 163 Cal.Rptr. 628, 634–35, 608 P.2d 716 (1980).

California law requires that

In determining the issue of defamation the publication in question must be considered in its entirety; *"[I]t may not be divided into segments and each portion treated as a separate unit."* (*Stevens v. Storke,* 191 Cal. 329, 334, 216 P. 371, 373.).... If the publication so construed is not reasonably susceptible of defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained.

*Corman v. Blanchard,* 211 Cal.App.2d 126, 27 Cal.Rptr. 327, 332 (1963) (emphasis added). *See Selleck v. Globe Int'l, Inc.,* 166 Cal.App.3d 1123, 212 Cal.Rptr. 838, 843–44 (1985).[5]

Darcy's statements must, thus, be viewed in their entirety. The gist of Brown's claim is that Darcy falsely accused him of soliciting illegal payments. Each of Darcy's statements was made to buttress that charge. Darcy noted the bar bill and the abusive language only to better describe the details of the May 15, 1980 meeting. Darcy never stated that Brown was intoxicated. Brown, himself, admitted to drinking alcoholic beverages that evening. Likewise, the reference to Brown's gambling debts tended to prove Brown's motive for soliciting illegal payments. Viewed as a whole, Darcy's statements with regard to the bar bill, abusive language, and gambling debts were merely collateral to and further supported Darcy's accusation that Brown solicited an illegal payoff. The statements were not in and of themselves

---

**3.** Motorola also requested that Fullam submit to a polygraph examination. Faced with the decision to take a polygraph examination, Fullam resigned. Fullam died prior to trial.

**4.** I recognize that these cases are factually distinguishable, but the polygraph evidence here, as in those cases, was an integral part of the facts which formed the basis of this action.

**5.** *Corman* and *Selleck* dealt only with libel claims, while Brown asserts claims of both libel and slander.

reasonably susceptible of defamatory meaning.[6]

Appellees, additionally, contend that since Brown did not allege the defamatory nature of Darcy's statement regarding the gambling debts in his amended complaint nor later in the pretrial order, the trial court did not abuse its discretion by excluding the statements as independent grounds for recovery. In accord with Fed.R.Civ.P. 16(e), the Ninth Circuit has upheld the finality of a pretrial order. "[A] party need offer no proof at trial as to matters agreed to in the order, nor may a party offer evidence or advance theories at the trial which are not included in the order or which contradict its terms." *United States v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 (9th Cir.1981). The falsity of Darcy's remark concerning Brown's gambling debts was not placed at issue. The pretrial order merely included as a question of fact whether Motorola believed that Brown's gambling debts interfered with his ability to perform as an employee.[7] This question of fact was listed among other questions of fact which needed to be resolved in order to understand the events that took place before and after the May 15, 1980 meeting. Even liberally construed the pretrial order did not place at issue the defamatory nature of Darcy's alleged remark concerning Brown's gambling debts. The district court did not abuse its discretion in refusing to give the requested instruction.

I would affirm the judgment of the district court.

---

**6.** Moreover, Brown was permitted to argue to the jury that Darcy's statements about Brown's abusive manner, gambling debts, and the bar bill were false and that if Darcy were untruthful about these statements, he may be untruthful about others. The jury was not allowed to evaluate these collateral statements as independent bases of liability.

**7.** The pretrial order preserved as a question of fact:

Whether at any time on or before September 15, 1980, any representative of Motorola believed that Mr. Brown's gambling habits in any way interfered with his ability to perform as a Motorola employee and officer.